2012 Ark. App. 308

**Peter James HUDSON, Appellant**

v.

**Deanna Lynn HUDSON, Appellee.**

**No. CA 11–1045.**

Court of Appeals of Arkansas.

May 2, 2012.

Jodi G. Carney, Carney Law Firm, Mountain Home, for Appellant.

Emily Reed, Mountain Home, for Appellee.

RITA W. GRUBER, Judge.

Deanna and Peter Hudson were divorced in October 2005, and Ms. Hudson was awarded custody of their four-year-old daughter. Mr. Hudson, who lived in Tennessee, was awarded visitation that included two months and two weeks each summer. He filed a petition to change custody on August 16, 2010, setting forth concerns that the child's emotional health and safety had been affected by the situation in her mother's home, where a violent boyfriend lived with Ms. Hudson. The circuit court entered a temporary order reflecting a September 2010 agreement between the parties, which forbade Ms. Hudson from allowing Joe Chaffee (the boyfriend) to reside in her home while the daughter was present or allow him to contact the child.[1] Mr. Hudson was also awarded, during the pendency of his action, additional visitation every other weekend and during school lunch once each week.

After conducting a hearing in January 2011, the court issued a letter opinion denying the change of custody. The court complimented Mr. Hudson for acting in his daughter's best interest by bringing to light issues of concern and the child's unhappiness with Mr. Chaffee. The court acknowledged Mr. Hudson's substantial sacrifice of residing in Mountain Home during the majority of the previous school year and noted the benefit he had received through his visitation time. The court found that Mr. Hudson's actions had resulted in the prior situation being substantially resolved, and it did not find a significant change in circumstances affecting the child's best interest or jeopardizing her well being and warranting a change of custody. The court filed a subsequent written order on July 26, 2011. Mr. Hudson raises one issue on appeal, contending that the circuit court erred in finding no substantial change in circumstances sufficient to modify custody. We affirm.

Attached to Mr. Hudson's petition to change custody was a letter from a Tennessee counselor who had seen the child, M.H., during the summer of 2010 to discuss problems she reported about her mother's home. Among the reported problems were that she was made to stay outside while taking care of her siblings and that she watched them while her mother and boyfriend fought in the bedroom. According to the report, the daughter believed that her mother had been hit during one fight, after which the mother took the children to the grandparents' home and the boyfriend threatened to burn the house and kill the dog; the children stayed there for three days and then returned home. The daughter had been

---

1. The petition to change custody was transferred to the Circuit Court of Baxter County from the Circuit Court of Lonoke County, which had entered the decree of divorce. Prior to this transfer, Mr. Hudson had filed for an order of protection in Baxter County; the order of protection was later dismissed.

very afraid of the boyfriend since that time—worrying while at home, fearing for her safety even while away, and fearing that her house would burn while she slept.

The child explained to the counselor that she was having difficulty in school because no one would help her with school work and because, even on extremely hot days, she had to stay outside while her mother and boyfriend were inside. In mother-daughter telephone conversations during visitations with the father, according to the child, the mother made promises that things would be different at home—but they never were. The counselor had serious concerns about the emotional harm the child experienced in the mother's home and concluded that there was a possibility the child could be in imminent danger if she were returned.

At the final hearing, testimony was given by the parties; M.H., who was then nine; the assistant principal at her school, Cassie Fowler; and Ms. Hudson's mother, Vesta Bush. Ms. Hudson [2] testified that she also had two young sons: a four year old whose father she married in 2006 and never divorced, despite not living with him for the three years preceding the hearing; and an eight month old fathered by Mr. Chaffee, whom she had not married. She testified that she and Mr. Chaffee began living together in the summer of 2008 but separated in September 2010 shortly after Mr. Hudson initiated court proceedings. She testified that she was afraid of Mr. Chaffee at times but had not realized how strongly her daughter, who would have picked up on that fear, felt about him and had not realized that she was upset or uncomfortable with him. Ms. Hudson admitted that there had been weekly fighting, arguing, and yelling between the couple in the home when the children were there. She denied that the arguments

were physical, that Mr. Chaffee threatened her or her children, that he threatened to burn the house or kill the dog, or that she told anyone he had made such threats.

Ms. Hudson testified that she previously had worked from 10:00 p.m. to 6:00 a.m. but in September 2010, around the time that court proceedings were initiated, she began working the 6:00 a.m. to 2:00 p.m. shift. Her four year old was in daycare, and the baby stayed with Mr. Chaffee. M.H. stayed Wednesday and Thursday nights at her maternal grandmother's, where for five years she had always "spent a night or two," and the grandmother took her to school Thursday and Friday mornings. M.H. rode the school bus from the home of Ms. Hudson's friend other mornings and occasionally took the afternoon bus to her mother's job, but Ms. Hudson usually did the after-school pickup. She said that she had attended every meeting requested by teachers since M.H.'s kindergarten year, was in contact about teacher meetings and progress reports, and usually spent an hour with the child on homework, a schedule that the grandmother also kept.

Ms. Hudson said that her mother had mentioned that M.H. "wasn't real thrilled about Joe," but summer visitation was about to begin and Ms. Hudson never discussed it with M.H. Ms. Hudson testified that she could "absolutely abide" by a court order forever prohibiting Mr. Chaffee from having contact with the daughter, should one be given, explaining that the couple communicated to transfer the eight month old and met during M.H.'s school hours and that pick-up could also be by Mr. Chaffee's mother or at her home. Expressing concern about M.H.'s health and the possibility of her becoming diabetic, Ms. Hudson said that M.H. usually re-

---

2. Ms. Hudson was also known as Deanna Lynn Blue.

turned from summer visitation ten to twenty pounds heavier than when she had left.

M.H. testified that she had lived primarily with her mom in Mountain Home since the divorce, first with her stepdad and then Mr. Chaffee, but he could no longer be around her because of an order of protection. She said that there was a lot of screaming and door slamming with him, and one argument was so bad she cried: he slammed the door and yelled and said a bunch of cuss words, and she overheard her mother say to her grandmother that he threatened to burn down the house. She reiterated her mother's testimony about staying at her grandparents' house each week, about transportation for school, and about not telling her mother that she was uncomfortable with Mr. Chaffee. She said that she liked seeing friends at her mom's house, would rather play than watch her brother, and did not like it when he did not listen or when her mother and Mr. Chaffee fought. M.H. said she knew that she would have to move should the court change custody, she had a really good relationship with her Tennessee stepmother and six-year-old sister, there was nothing she did not like about her dad's house, and she wanted to live with him and visit her mom in the summer.[3]

Mr. Hudson testified that he lived in Tennessee after his 2005 divorce and always exercised his visitation, which included family activities and summer day camp. He related that toward the end of summer break in 2010, M.H. had become emotional, nervous, upset, and extremely reserved and apprehensive. He followed the advice of a friend who dealt with family cases to get M.H. a counselor, allowing her to talk about her problems without fear of them being expressed to anyone else. He testified that he contacted Ms. Hudson a few weeks before summer visitation ended and told her that "something was going on" and M.H. wanted to live at his home in Tennessee.

Mr. Hudson testified that he had accompanied M.H. back to Arkansas at the end of visitation, initiated court proceedings, attended a hearing concerning the order of protection, and arranged to stay in Mountain Home until the permanent hearing. He testified that he continued to observe the same emotional problems in M.H., including an hour-long emotional breakdown in October when he and she were building chicken-nest boxes: she progressed from uneasy to mad, threw the hammer, cried, and said she wanted to go home to her stepmother and stepsister. Mr. Hudson expressed concern about the amount of time M.H. spent outside her mother's home, such as the amount of time with grandparents. He believed that Ms. Hudson neglected M.H.'s educational needs and let her rely on her grandmother to study with her. He said that he was unhappy with a C she had made, so he had been studying with her on Wednesday nights.

Mr. Hudson said he had no reason to believe that the order of protection had been violated or that M.H. had been exposed to Mr. Chaffee. He admitted that his current wife had moved in with him a few months before they married, and there had been a ten-day period when they were living together and M.H. was visiting. He said that his parents lived in Calico Rock but had no contact with M.H. except for his visitation during holidays, and that there was no more family in Nashville.

Vesta Bush testified that she had talked to Mr. Hudson about M.H. having

---

3. For simplicity's sake in this opinion, "Ms. Hudson" will refer to appellee alone. Mr. Hudson's current wife did not testify and was not otherwise a party to these proceedings.

difficulty doing homework close to bedtime, explaining that until three weeks ago M.H. did not have it done when he brought her over at 8:00 p.m. Wednesdays. She testified that over the last six or seven years, she had seen M.H. three to five days each week. M.H. regularly spent Wednesday and Thursday nights with her, and Ms. Bush had kept her on weekends when Ms. Hudson worked the third shift. Ms. Bush testified about becoming aware just before summer that M.H. did not care for Mr. Chaffee and about addressing the topic with Ms. Hudson, but Ms. Bush denied that M.H. was afraid of him. She said that she knew of no contact between Ms. Hudson and Mr. Chaffee except when they exchanged the baby, and she stated her belief that Ms. Hudson had made adequate arrangements to shield M.H. from Mr. Chaffee.

Ms. Fowler, the intermediate-school assistant principal, testified that she had no information that Ms. Hudson was not interested in M.H.'s progress and had no contact with Mr. Hudson before August 2010. She said that M.H.'s fourth-grade academic progress was "fine," she was making average grades, and she had done well the previous year on benchmark standardized tests.

■ Mr. Hudson contends on appeal that the circuit court erred in denying his petition to change custody. He points to M.H.'s bravery in exposing the issues of domestic abuse, the existence of an order of protection against Ms. Hudson's boyfriend prohibiting contact with M.H., and the child's court testimony that she preferred residing with her father. He notes Ms. Hudson's testimony confirming "the existence of domestic violence" and the fact that she resided with the offender while married to someone else. Based on testimony at the hearing and on case law, he concludes that there was sufficient evidence to find that a change in circumstances had occurred.

■ In *Ketron v. Ketron*, 15 Ark.App. 325, 692 S.W.2d 261 (1985), the mother was living with a man who was married but separated from his wife; the trial court ordered her to terminate her living arrangement and allowed the mother to retain custody. *Cf. Scherm v. Scherm*, 12 Ark.App. 207, 671 S.W.2d 224 (1984) (approving a change in custody where the custodial parent had been involved in illicit sexual relationships). A parent's promiscuous conduct or lifestyle is never condoned when such conduct is in the presence of the child. *Thigpen v. Carpenter*, 21 Ark.App. 194, 730 S.W.2d 510 (1987) (citing *Ketron, supra*); *see also Digby v. Digby*, 263 Ark. 813, 567 S.W.2d 290 (1978). However, the primary consideration in awarding custody of children is the welfare and best interest of the children involved, and custody is not awarded as reward or punishment of either parent. *Ketron, supra.*

Although traditional equity cases are reviewed de novo on appeal, we will not disturb the trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Turner v. Benson*, 59 Ark.App. 108, 953 S.W.2d 596 (1997). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.* Since the question turns largely on the credibility and demeanor of witnesses, this court defers to the superior position of the trial court to make such determinations; the trial court assigns the weight to be given a child's preference, and it is not binding on the court. *Id.* Here, there was evidence that Ms. Hudson lived with two different men after receiving custody of M.H.; that be-

fore M.H. left for summer visitation in 2010, Mr. Chaffee had lived in her home for two years; that the couple engaged in loud, frequent arguments; and that Ms. Hudson sometimes feared him. Ms. Hudson's mother mentioned to her that M.H. did not care for the boyfriend, and M.H.'s father arranged for her to see a counselor in Tennessee when he became concerned about her. Mr. Hudson admirably returned to Arkansas and began court proceedings, Mr. Chaffee moved out of Ms. Hudson's home, and an order of protection was obtained to prevent his contacting M.H. The trial court found that the situation of former concern had been resolved, and it found no significant change in circumstances affecting M.H.'s best interest or jeopardizing her well being and warranting a change of custody. Based on our de novo review and giving due deference to the superior position of the circuit court to evaluate the witnesses, we find no clear error in its decision not to change custody.

Affirmed.

HART and GLOVER, JJ., agree.